CLERKS OFFICE U.S. DIST. COURT   JRT
AT CHARLOTTESVILLE, VA
FILED
May 02, 2025
LAURA A. AUSTIN, CLERK
BY   s/ S. MELVIN
   DEPUTY CLERK
   DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
# CHARLOTTESVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>NORMAN EUGENE GOINS, JR.<br><br>*Defendant.* | CASE NO. 3:23-cr-00015-018<br><br>**MEMORANDUM OPINION**<br><br>JUDGE NORMAN K. MOON |

Defendant Norman Eugene Goins, Jr. moves to suppress evidence obtained from two pole cameras that law enforcement installed near co-defendant Laqueshia Burgess's business for a four-month period in 2023. Dkt. 710. Because the cameras monitored a publicly-accessible parking lot and building exterior, the Defendant had no reasonable expectation of privacy at this location. Thus, the Government's conduct did not constitute a "search" within the meaning of the Fourth Amendment and the Defendant's motion is denied.

## I. BACKGROUND

As part of an ongoing cocaine and methamphetamine trafficking investigation in Central Virginia, law enforcement interviewed two sources of information in early 2023. Dkt. 724-2. One of the sources alleged that the Defendant transported drugs inside products sold by a clothing business owned by his girlfriend, Burgess. *Id*. Law enforcement agents subsequently identified the business as "Tha Bully," which had a distribution center at 340 Greenbrier Drive in Charlottesville, Virginia. *Id*.

1

On May 2, 2023, law enforcement seized an empty box from an open dumpster located in a publicly-accessible parking lot outside Tha Bully. *Id*. The box was addressed to Burgess. *Id*. Swabs taken from inside it tested positive for amphetamines and methamphetamine. *Id*.[1]

On May 5, 2023, law enforcement installed a pair of cameras near Tha Bully. Dkt. 724-1. The Government did so without a warrant, although it received permission from the two business along Greenbrier Drive where it placed them. DEA Special Agent Patrick Boucher ("SA Boucher") met with an engineering firm and got permission to place a camera on the firm's window to record the front entrance, vestibule, and front door to Tha Bully. *Id*. He also met with a gas company across the street from Tha Bully, which gave permission to install a camera on its communications tower. *Id*. The tower camera recorded the front door area, a loading dock, and a public parking lot outside Tha Bully. *Id*. The cameras were active between the installation date and September 2023. *Id*. SA Boucher states that the cameras captured the Defendant's "sporadic appearances at 340 Greenbrier Drive, averaging not more than one time per week." *Id*.

The Defendant now moves to suppress evidence from these cameras, arguing that the cameras constituted a warrantless search in violation of the Fourth Amendment.[2]

## II. LEGAL STANDARDS

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const.

---

[1] According to an affidavit by DEA Special Agent George Ott, Government agents used a device called a "portable mass spectrometer" to test for drug residue. Dkt. 724-2 at 5.

[2] The defendant also contends that the Government engaged in unlawful trespass when placing the cameras. However, the Government has produced evidence that it had express permission from nearby property owners to install the cameras, Dkt. 724-1, and the Defendant has not challenged this. Accordingly, this argument lacks merit and is not addressed in this Memorandum Opinion.

2

amend. IV. "Warrantless searches are presumptively unreasonable," although there are some limited exceptions to the rule. *United States v. Karo*, 468 U.S. 705, 717 (1984).

A defendant bears the burden of proof on a motion to suppress. *See United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981) ("Unquestionably the district court was correct in placing that burden of proof upon the defendant, since '(t)he proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure.'" (quoting *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1981)).

### III. DISCUSSION

**A. The warrantless placement of a pole camera was not a Fourth Amendment "search"**

The threshold question is whether placement of cameras near Tha Bully is a "search" that implicates the Fourth Amendment. As the Fourth Circuit has explained, "a search occurs for constitutional purposes only 'when an expectation of privacy that society is prepared to consider reasonable is infringed,' and '[o]fficial conduct that does not compromise any legitimate interest in privacy is not a search subject to the Fourth Amendment.'" *United States v. Stephens*, 764 F.3d 327, 331 (4th Cir. 2014) (citations omitted). "'In order to demonstrate a legitimate expectation of privacy, [a defendant] must have a subjective expectation of privacy,' and that subjective expectation of privacy must be 'objectively reasonable; in other words, it must be an expectation that society is willing to recognize as reasonable.' The burden of showing a legitimate expectation of privacy in the area searched rests with the defendant." *United States v. Castellanos*, 716 F.3d 828, 832 (4th Cir. 2013) (citations omitted).

"What a person knowingly exposes to the public … is not a subject of Fourth Amendment protection." *Katz v. United States*, 389 U.S. 347, 351 (1967). Indeed, the Supreme

3

Court has not interpreted the Fourth Amendment "to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares." *California v. Ciraolo*, 476 U.S. 207, 213 (1986). Similarly, residents of an apartment complex do not have a reasonable expectation of privacy in a publicly accessible common area. *United States v. Jackson*, 728 F.3d 367, 373–74 (4th Cir. 2013). In other cases, neither aerial surveillance of an industrial plant complex nor of marijuana plants in a backyard has been found to be a Fourth Amendment "search." *Dow Chemical Co. v. United States*, 476 U.S. 227, 239 (4th Cir. 1986); *Ciraolo*, 476 U.S. at 213-15. The Supreme Court explained in *Dow* that "[i]t may well be, as the Government concedes, that surveillance of private property by using highly sophisticated surveillance equipment not generally available to the public, such as satellite technology, might be constitutionally proscribed absent a warrant. But the [aerial] photographs here are not so revealing of intimate details as to raise constitutional concerns. … The mere fact that human vision is enhanced somewhat, at least to the degree here, does not give rise to constitutional problems." 476 U.S. at 238. The key takeaway from these cases is that law enforcement often does not need a warrant to surveil public-facing activities.

To be sure, there are limits to warrantless surveillance and tracking of otherwise public-facing activity. The *Katz* decision cited above also made this point. 389 U.S. at 351 (observing that what a person "seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected."). The Defendant points to two cases that illustrate this principle. In *United States v. Jones*, the Supreme Court held that when the Government attaches a GPS device to a person's vehicle for the purpose of monitoring the vehicle's movements, such action constitutes a "search." 565 U.S. 400, 404 (2012).[3] Then, in *United States v. Carpenter*, the Court

---

[3] The *Jones* decision was primarily based on the Government's physical occupation of private property (a vehicle) for the purpose of obtaining information. 565 U.S. at 404. Although the Government argued there was "no search"

4

found that cell-site location information ("CLSI") provided such comprehensive and detailed information about a person's life that it required Fourth Amendment protections. 585 U.S. 296, 320 (2018); *see also id*. at 311 (explaining that mapping a cell phone's location over time "provides an all-encompassing record of the holder's whereabouts" and an "intimate window into a person's life."). Thus, the Government generally needs a warrant to access CSLI. These cases stand for the proposition that individuals have a reasonable expectation of privacy "in the whole of their physical movements." *Id*. at 310.

The Fourth Circuit subsequently applied *Carpenter* when assessing a municipal aerial surveillance program capable of tracking the movement of every person outside in Baltimore and storing the data for 45 days. *Leaders of a Beautiful Struggle v. Baltimore Police Department*, 2 F.4th 330, 341 (4th Cir. 2021) (en banc). There, the Court held that "[b]ecause the AIR program enables police to deduce from the whole of individuals' movements … accessing its data is a search, and its warrantless operation violates the Fourth Amendment." *Id*. at 346.

Cases like *Carpenter* and *Leaders of a Beautiful Struggle* underscore that surveillance programs which track the *entirety* of an individual's physical movements in public violate reasonable expectations of privacy. A distinguishing feature of such programs is their ability to "provide a comprehensive chronicle of the user's past movements." *Carpenter*, 585 U.S. at 300; *see also Leaders of a Beautiful Struggle*, 2 F.4th at 346 ("The AIR program records the movements of a city. With analysis, it can reveal where individuals come and go over an extended period."). These cases say little about "ordinary police capabilities." *Id*. at 345. ("People understand that they may be filmed by security cameras on city streets, or a police

---

because there would have been "no 'reasonable expectation of privacy' in the area of the Jeep accessed by Government agents (its underbody) and in the locations of the Jeep on the public roads, which were visible to all," the Court determined it did not need to address these contentions because it could resolve the case with a common-law trespass analysis. *Id*. at 406-07.

5

officer could stake out their house and tail them for a time. … But capturing everyone's movements outside during the daytime for 45 days goes beyond that ordinary capacity."); *Carpenter*, 585 U.S. at 316 ("We do not … call into question conventional surveillance techniques and tools, such as security cameras.").

To succeed on his motion to suppress, the Defendant must first show that he had a legitimate expectation of privacy that was the subject of a "search." More specifically, he must have (1) a subjective expectation of privacy and (2) that subjective expectation of privacy must be "objectively reasonable," meaning it is one that society would be willing to recognize as reasonable. *Castellanos*, 716 F.3d 828, 832.

Courts often look at "efforts to conceal and keep private" the subject of a purported search when considering whether a "subjective expectation of privacy" is present. *United States v. Villegas*, 495 F.3d 761, 767 (7th Cir. 2007). For example, an individual who erects a fence to screen activities from the view of people on a nearby street might manifest a subjective expectation of privacy under certain circumstances. *See, e.g., United States v. Cuevas-Sanchez*, 821 F.2d 248, 251 (5th Cir. 1987). Here, however, the Defendant's motion and the record before the Court is devoid of information about what efforts, if any, the Defendant took to conceal his presence outside of Tha Bully. The Defendant asserts a privacy interest in his "comings and goings," Dkt. 710 at 5, but how he exhibited a subjective expectation of privacy in a public area is unclear. He also asserts a privacy interest in the "aggregation" of location-related information, *id*. at 6, but fails to define the nature of the purported "police state aggregation" at issue and how he demonstrated a subjective privacy expectation in such an accessible public space. The Defendant has not manifested a subjective expectation of privacy.

6

To the extent the Defendant believes he has a reasonable privacy interest in either (1) his "comings and goings" to the surveilled location or (2) the aggregation of location information related to his presence at the site, society would not recognize such a privacy interest as objectively reasonable under these circumstances. Here, the two cameras recorded a publicly accessible parking lot and the outside of a business, all of which was visible from the street and nearby properties. The Defendant's presence in such a public site is the kind of scenario the Supreme Court likely had in mind when it noted that the Fourth Amendment does not require law enforcement officers "to shield their eyes" when passing a property on a public thoroughfare. *Ciraolo*, 476 U.S. at 213. Here, the Government could have permissibly stationed officers along Greenbrier Drive and surveilled the public parking lot and entrance to Tha Bully. As the Fourth Circuit noted in a somewhat similar case involving the warrantless installation of a pole camera, law enforcement's use of "a more resource-efficient surveillance method" to capture on video "what any passerby would have been able to observe" does not transform this investigative approach into an unconstitutional search. *United States v. Vankesteren*, 553 F.3d 286, 291 (4th Cir. 2009).[4]

The Defendant argues that the Court should rely on the Supreme Court's *Carpenter* decision to find that he had an objectively reasonable expectation of privacy in his movements that were captured on the cameras. Dkt. 710 at 6-8. He contends that the pole cameras' warrantless collection of "continuous video" threatens to chill "religious, political, and

---

[4] An important distinction between *Vankesteren* and the present case is that *Vankesteren* involved the so-called "Open Fields Doctrine," whereby an individual has no reasonable expectation of privacy in open fields beyond the curtilage of the home. In *Vankesteren*, government officials installed a camera on a farmer's open fields as part of an investigation into illegal bird trapping. 553 F.3d 286 at 288. Although Vankesteren conceded that he had no reasonable expectation of privacy in the open fields, he instead argued that the use of hidden surveillance cameras deserved a "higher degree of Fourth Amendment scrutiny." *Id*. at 290. The Fourth Circuit rejected this argument. The Court explained that "[s]ince Vankesteren had no legitimate expectation of privacy, the agents were free, as on public land, to use video surveillance to capture what any passerby would have been able to observe." *Id*. at 291.

associational activities." *Id*. at 8. But "[a]ny Fourth Amendment analysis turns on the totality of the circumstances and thus must be grounded on an accurate understanding of the facts." *United States v. Curry*, 965 F.3d 313, 316 (4th Cir. 2020). Here, the Defendant's fears of Orwellian surveillance are largely untethered from the facts in the record. These cameras only monitored the parking lot and exterior of a business. While they monitored the site for about fourth months, these cameras did not track or monitor the Defendant in other locations, nor did they surveil what the Defendant did inside of Tha Bully. As noted earlier, cases like *Carpenter* are concerned with an individual's "reasonable expectation of privacy in the whole of their physical movements." 585 U.S. at 311. Technologies like CLSI collection or Baltimore's aerial surveillance program created "comprehensive chronicle[s]" of a person's past movements." *Id.* at 300. Not so with the two fixed cameras here. DEA Special Agent Patrick Boucher's affidavit notes that the cameras only captured the Defendant's "sporadic appearances" at the site, "averaging not more than one time per week." Dkt. 724-1 at ¶ 9. This warrantless surveillance captured one aspect of the Defendant's life – when and how often he visited his girlfriend's business – but it did not come close to creating a comprehensive record of his whereabouts or who he associated with when he was off-site. Thus, the pole cameras, as utilized here, are meaningfully different from the all-encompassing surveillance techniques at issue in other cases. *Carpenter* is inapplicable to these facts.[5]

       The Fourth Circuit has not directly addressed the use of pole cameras post-*Carpenter*. However, all but one federal circuit court to consider the matter since the Supreme Court decided *Carpenter* in 2019 have held that warrantless pole camera surveillance does *not* constitute a Fourth Amendment search. *See United States v. Harry*, 2025 WL 732085, at *3-6 (2d Cir. Mar. 7,

---

[5] Indeed, the *Carpenter* decision was "a narrow one." 585 U.S. at 316. The Court expressly noted that it did not "call into question conventional surveillance techniques and tools, such as security cameras." *Id*.

2025) (finding that using stationary pole camera to monitor publicly visible exterior of a defendant's business for 50 days was not a Fourth Amendment "search"); *United States v. Gregory*, 128 F.4th 1228, 1240-44 (11th Cir. 2025) (finding that use of pole cameras focused on a defendant's home was not a search); *United States v. House*, 120 F.4th 1313, 1322-23 (7th Cir. 2024) (holding that the warrantless use of a pole camera to observe a home on a short- or long-term basis is not a Fourth Amendment search); *United States v. Hay*, 95 F.4th 1304, 1316 (10th Cir. 2024) (finding that camera surveillance of a home visible to a passerby is not a Fourth Amendment search*)*; *United States v. Dennis*, 41 F.4th 732, (5th Cir. 2022) (holding that defendant failed to show pole cameras aimed at his property unreasonably intruded into his privacy when all the cameras captured was the view from a public street); *United States v. May-Shaw*, 955 F.3d 563, 569 (6th Cir. 2020) (holding that warrantless pole camera surveillance of defendant's carport was not an unconstitutional search). The First Circuit, sitting *en banc*, deadlocked on this question. *United States v. Moore-Bush*, 36 F.4th 320 (1st Cir. 2022) (en banc). Still, no federal appellate court has expressly held that pole camera surveillance is a Fourth Amendment search that requires a warrant.[6]

      Moreover, while the Fourth Circuit did not analyze whether a warrantless pole camera is an unconstitutional search in *Leaders of a Beautiful Struggle*, the Court underscored a critical difference between pole cameras and surveillance technology that documents a wider range of movements. The Court explained that "pole cameras are fixed in place, meaning they generally only capture individual trips." 2 F.4th at 345. It then contrasted pole cameras with the plaintiffs'

---

[6] Outside of appellate case law, two district courts in this circuit concluded that warrantless pole camera surveillance did not amount to an unconstitutional search. *United States v. Edmonds*, 438 F.Supp.3d 689, 694 (S.D. W.Va. 2020) (rejecting defendant's argument that a warrant is required for a pole camera "placed in a public location with a view available to the public"); *see also United States v. Adams*, No. 3:08-CR-77, 2011 WL 13161193 at *5-6 (N.D. W.Va. Feb. 23, 2011) (finding that pole camera placed on a utility pole with a view of defendant's waiting room was not placed in an area where defendant had reasonable expectation of privacy).

concerns about Baltimore's aerial surveillance: "Plaintiffs do not object to what any one AIR image reveals or claim a privacy invasion related solely to being photographed … Rather, they challenge the creation of a retrospective database of everyone's movements across the city." *Id*. Because such data could reveal "where individuals come and go over an extended period," the Court concluded that accessing it is a "search." *Id*. at 346. The Fourth Circuit's analysis suggests that stationary pole cameras, like the ones the Defendant challenges here, are meaningfully distinct from the comprehensive surveillance methods in *Carpenter* and *Leaders of a Beautiful Struggle*. Accordingly, the Court has no reason to break with the weight of authority finding that a warrant is not required to surveil publicly visible locations with a pole camera.

**B. Even if the use of the pole cameras was an unconstitutional "search," the evidence derived from this surveillance is admissible under the good faith exception**

The Government contends that even if its use of the pole cameras was unlawful, the Court should not suppress the evidence derived from the cameras based on the good faith exception to the exclusionary rule. Dkt. 724 at 22. The Court agrees.

"In the Fourth Amendment context … the Supreme Court has required the suppression of incriminating evidence if law enforcement violates the Constitution." *United States v. Santos-Portillo*, 997 F.3d 159, 163 (4th Cir. 2021). However, "[e]vidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule." *Davis v. United States*, 564 U.S. 229, 241 (2011).

As explained above, binding precedent does not require law enforcement to obtain a warrant to surveil publicly visible and accessible spaces with stationary pole cameras. The Supreme Court has expressly held that the Fourth Amendment does not "require law

10

enforcement officers to shield their eyes when passing by a home on public thoroughfares," nor does "the mere fact that an individual has taken measures to restrict some views of his activities preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible." *Ciraolo*, 476 U.S. at 213 (1986). Moreover, the Fourth Circuit rejected a challenge to the warrantless surveillance of a property with a pole camera in *Vankesteren*. Although that case involved "open fields," the Court explained that law enforcement agents "were free, as on public land, to use video surveillance to capture what any passerby would have been able to observe." 553 F.3d at 291. Accordingly, law enforcement reasonably adhered to precedent when it surveilled the public parking lot and exterior of Tha Bully without a warrant.

*Carpenter* does not change this analysis. Dkt. 724 at 22. Indeed, the *Carpenter* decision was "a narrow one." 585 U.S. at 316. The *Carpenter* majority expressly noted that it did not "call into question conventional surveillance techniques and tools, such as security cameras." *Id*. And as the post-*Carpenter* case law demonstrates, no appellate court has embraced the Defendant's position that the use of pole cameras is a Fourth Amendment search. Accordingly, the legal landscape governing warrantless pole camera surveillance has not shifted since *Carpenter*.

## CONCLUSION

For the reasons provided, the Defendant's motion to suppress the evidence derived from the pole cameras, Dkt. 710, is **DENIED**. The Court will enter an accompanying order on this date.

Entered this 2nd day of May, 2025.

_____
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE