CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
May 02, 2025
LAURA A. AUSTIN, CLERK
BY  s/ S. MELVIN
    DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
# CHARLOTTESVILLE DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA | CASE NO. 3:23-cr-00015-018 |
| v. | **MEMORANDUM OPINION** |
| NORMAN EUGENE GOINS, JR. | |
| *Defendant.* | JUDGE NORMAN K. MOON |

Defendant Norman Eugene Goins, Jr. moves to suppress evidence obtained pursuant to two GPS tracker warrants because he contends both warrants were based on affidavits that lacked probable cause. Dkts. 711, 712.  At a hearing on March 27, 2025, the Court orally denied the motions. This Memorandum Opinion elaborates on the Court's reasoning.

## I. BACKGROUND

On May 9, 2023, United States Magistrate Judge Joel C. Hoppe issued a tracking warrant authorizing law enforcement to install and use an electronic tracking device to aid surveillance of the Defendant's 2020 Dodge Challenger Hellcat as part of an investigation into possible violations of federal drug trafficking and conspiracy statutes (21 U.S.C. §§ 841(a)(1) and 846). Dkt. 724-2. On June 23, 2023, Judge Hoppe issued a warrant to extend the tracking of the Defendant's vehicle. Dkt. 724-3.

Both warrants were issued based on affidavits submitted by George Ott, a special agent with the Drug Enforcement Administration ("SA Ott").

1

SA Ott's initial affidavit in support of the May 9 tracker warrant explained that law enforcement believed that the Defendant was using his vehicle for purposes of transporting and distributing methamphetamine in the Charlottesville area. Dkt. 724-2 at ¶ 9. SA Ott provided numerous details about why the Defendant had become a target of investigation:

- In February and March of 2023, investigators interviewed two "sources of information." The "SOIs" were federal defendants who "made statements against their penal interests in proffer interviews." Law enforcement interviewed the SOIs separately. *Id*. at ¶ 12.

- The SOIs described a drug trafficking organization ("DTO") led by the Defendant with the assistance of his girlfriend, co-defendant Laqueshia Burgess. This DTO allegedly trafficked cocaine and methamphetamine. *Id*. at ¶ 13.

- The SOIs corroborated one another because each separately identified the Defendant. SOI 1 gave law enforcement the Defendant's full name and said the Defendant uses the nickname "Rock." SOI 2 identified the leader of the DTO as a Black male with the name "Norman" and the nickname "Roc." SOI 2 also identified the Defendant from a DMV photo. *Id*. at ¶ 13.

- SOI 2 reported that they previously purchased drugs from the Defendant — specifically, kilogram quantities of cocaine and two-to-five-pound quantities of methamphetamine. *Id*. at ¶ 15.

- The SOIs also provided details that law enforcement corroborated.  For example, SOI 1 told law enforcement that the defendant drives a "dark grey Hellcat charger." *Id*. at ¶ 16. On May 8, 2023, law enforcement

2

- observed the Defendant operating the same kind of car at 340 Greenbrier Drive in Charlottesville, Virginia. *Id*. at ¶ 22. This was the address of a clothing business owned by co-defendant Burgess. *Id*. at ¶ 17.

- SOI 1 also said in their interview that the Defendant uses co-defendant Burgess's clothing company to transport drugs. *Id*. at ¶ 16. Law enforcement uncovered evidence consistent with this allegation. First, they determined that Burgess did, in fact, have a clothing business under the name "Tha Buly LLC" and that it had a distribution center at 340 Greenbrier Drive. Then, on May 2, 2023, law enforcement seized a cardboard box from an open-top dumpster in a publicly-accessible parking lot outside of the business. The empty box had a shipping label addressed to co-defendant Burgess from a Chinese address. Law enforcement tested swabs taken from inside the box for drug residue using a portable mass spectrometer. The swabs tested positive for amphetamines and methamphetamine. *Id*. at ¶ 19.

- Law enforcement also observed the Defendant meet with Bobby Christmas, who SA Ott described as a "pound level distributor of methamphetamine." *Id*. at ¶ 20. Between March 29, 2023 and April 27, 2023, a confidential source conducted five controlled purchases from Christmas. These transactions totaled 5.4 pounds of methamphetamine. *Id*. at ¶ 21. On May 8, 2023, the Defendant was observed at Tha Bully. A couple hours later, Christmas parked his vehicle next to the Defendant's car. Shortly thereafter, the Defendant exited the business and got inside

3

> Christmas's vehicle. The two men were in Christmas's vehicle for half an hour. The Defendant then exited Christmas's vehicle, went back into the business, and returned to his own car. The Defendant and Christmas then separately drove their own vehicles to the Charlottesville-Albemarle Airport. There, the Defendant parked his vehicle in the long-term parking lot and Christmas picked him up from a taxi stand. The Defendant and Christmas returned to Tha Bully on Greenbrier Drive. They sat inside the car for over half an hour, then the Defendant went into the building and Christmas drove away. *Id*. at ¶¶ 22-28.

Based on these factual allegations, SA Ott requested authority to track the Defendant's vehicle for 45 days for law enforcement to "determine the location of [the Defendant] and/or his co-conspirators without placing them under non-stop physical surveillance, avoid detention that might occur with physical surveillance, and ascertain where they may be picking up, delivering, and/or stashing their drugs." *Id*. at ¶ 29. Judge Hoppe approved the tracking warrant. Later that same day, investigators placed a GPS device on the Defendant's Dodge while it was in the airport parking lot. Dkt. 724-3 at ¶ 31.

      On June 23, 2023, SA Ott submitted an application to renew the tracking warrant for an additional 45-day period. Dkt. 724-3. His affidavit in support of renewal contained the same information summarized above. However, SA Ott added new details about two dates where investigators tracked or observed significant activity.

      First, SA Ott wrote that on the evening of May 17, 2023, the tracking data for the Defendant's GPS device matched the GPS data for Christmas's vehicle, meaning the vehicles were in the same location. *Id*. at ¶ 33. Law enforcement observed the two vehicles backed up to

4

each other on Old Brook Road in Charlottesville. *Id*. at ¶ 34. The Defendant and Christmas stood outside the vehicles. *Id*. When investigators changed their position, they saw the trunks were closed and that both men were sitting in Christmas's vehicle. *Id*. at ¶ 35. Minutes later, the Defendant exited Christmas's vehicle and got in his own car. *Id*. at ¶ 36. GPS data showed that the Defendant's vehicle traveled north along U.S. Route 29 to Fairfax County, Virginia. *Id*. at ¶¶ 36-37. In Fairfax, the vehicle was parked at an address associated with Roberto Polo-Sherk, who SA Ott noted had been linked to "two other active DEA investigations." *Id*. at ¶ 38. (In May 2023, the Government detained Polo-Sherk in Chicago during a controlled delivery of cocaine. *Id*.)

Second, SA Ott summarized the Defendant's vehicle's movements on May 24, 2023. On that day, the vehicle traveled to an address in Henrico, Virginia linked to Dushaun Gregory. *Id*. at ¶ 39. In April 2023, Gregory was a source of supply for a different individual, Brandon Dent, when a confidential source conducted a controlled buy of 455 grams of methamphetamine. *Id*. at ¶ 45. On June 6, 2023, a different confidential source made a controlled purchase of 460 grams of methamphetamine from Gregory. *Id*. at ¶ 46. SA Ott wrote in his affidavit that on May 24, 2023, the Defendant's vehicle was at Gregory's last known address between 1:12 p.m. and 1:31 p.m. *Id*. at ¶¶ 39-40. The vehicle then moved to a nearby parking lot. *Id*. at ¶ 40. At 1:50 p.m., law enforcement "visually confirmed" the Defendant's vehicle was at that location. *Id*. at ¶ 41. Law enforcement also drove past Gregory's address and his blue 2010 Buick was parked outside. *Id*. at ¶ 42. GPS data showed that the Defendant's vehicle subsequently traveled to Short Pump Town Center Mall and stopped at a Chase Bank location at 2:16 p.m. *Id*. at ¶ 43.

Judge Hoppe approved the renewed tracking warrant on June 23, 2023.

5

The Defendant now moves to suppress the two GPS tracker warrants. Dkts, 711, 712. His arguments in each motion are largely the same. He asserts that the affidavits lacked probable cause because of a number of purported omissions. For example, he contends that the warrant applications contained "no details" about how the SOIs corroborated one another or how law enforcement corroborated the SOIs. Dkt. 711 at 3; Dkt. 712 at 2-3. He also argues there was no information about whether the SOIs were "angling for leniency predicated upon accurate information." Dkt. 711 at 3; Dkt. 712 at 3. The warrant applications relied on "untethered accusations of two incarcerated informants without further corroboration or verification." Dkt. 711 at 6; Dkt. 712 at 7. As to the warrant renewal application, the Defendant also takes issue with omissions such as whether the Defendant was actually observed in his vehicle when it arrived in Fairfax or when it traveled to Henrico. Dkt. 712 at 5.

## II. LEGAL STANDARDS

The Fourth Amendment protects individuals from "unreasonable searches and seizures," and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The use of a GPS tracking devise constitutes a search requiring a warrant. *See United States v. Jones*, 565 U.S. 400, 404 (2012).

"Whether probable cause for a search exists is a 'practical, common-sense' question, asking whether 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Blakeney*, 949 F.3d 851, 859 (4th Cir. 2020) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983). When assessing probable cause, a magistrate may draw "reasonable, commonsense inferences" based on "the totality of the circumstances." *United*

6

*States v. Richardson*, 607 F.3d 357, 371 (4th Cir. 2010). Probable cause is "not a high bar" and law enforcement officers "need not 'rule out a suspect's innocent explanation for suspicious facts' to obtain a warrant." *United States v. Bosyk*, 933 F.3d 319, 325 (4th Cir. 2019) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 586, 588 (2018)).

When reviewing a magistrate judge's issuance of a search warrant, this Court asks whether the magistrate "had a substantial basis for concluding that a search would uncover evidence of wrongdoing." *Bosyk*, 933 F.3d at 325 (quoting *Gates*, 462 U.S. at 325). Thus, the magistrate's decision is reviewed with "great deference." *United States v. Briscoe*, 101 F.4th 282, 294 (4th Cir. 2024). This deferential approach is consistent with the Supreme Court's instruction in *Gates* that "courts should not invalidate ... warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a commonsense, manner." 462 U.S. at 236 (quoting *United States v. Ventresca*, 380 U.S. 102, 109 (1965)). When conducting its review, the Court only considers the facts presented to the magistrate in the underlying warrant application. *Boysk*, 933 F.3d at 325 (citing *United States v. Lyles*, 910 F.3d 787, 791 (4th Cir. 2018)).

If a search warrant is determined to have lacked probable cause, "the evidence obtained will not be suppressed if the executing officer relied on the warrant in objectively reasonable good faith." *Blakeney*, 949 F.3d at 859.

### III. DISCUSSION

**A. Both tracker warrants were supported by probable cause**

The magistrate judge's probable cause determination was valid based on "the totality of the circumstances." *Richardson*, 607 F.3d at 371. These affidavits included information from two sources who not only corroborated each other, but who provided information that a law

7

enforcement investigation corroborated. In other words, multiple levels of corroboration bolstered these sources' credibility. The sources corroborated each other with respect to certain details, like the Defendant's name and alias. Dkt. 724-2 at ¶ 14. Law enforcement also found evidence consistent with the SOI's claims. For example, SOI 1 alleged that the Defendant utilized co-defendant Burgess's clothing business to ship drugs. Dkt. 724-2 at ¶ 16. Law enforcement later swabbed an empty box found in a dumpster outside the business and addressed to Burgess. *Id*. at ¶19. The swabs tested positive for amphetamines and methamphetamine. *Id*. Law enforcement also observed the Defendant meet in a car for an extended period of time with Bobby Christmas, a distributor with whom law enforcement had conducted controlled buys of methamphetamine in March and April of 2023. *Id*. at ¶¶ 20-28. Christmas also traveled to the airport at the same time as the Defendant and drove the Defendant back to the clothing business after the Defendant left his vehicle in the airport parking lot. *Id*. at ¶¶ 26-28. Taken together, these circumstances provided Judge Hoppe with a "substantial basis for concluding that a search would uncover evidence of wrongdoing," *Bosyk*, 933 F.3d at 325, related to the Defendant's alleged drug trafficking activities.

The same is true as to the affidavit submitted in support of an extension of the tracker warrant. This affidavit featured the same information as the affidavit for the initial warrant and the details related to surveillance and GPS tracking from May 17 and May 24, 2024. As the Government correctly notes, these incidents "further corroborate" the SOIs' allegations that the Defendant engaged in drug trafficking and demonstrate that the tracking device had assisted the Government in linking the Defendant to specific individuals whom it believed he was supplying with narcotics. Dkt. 724 at 21. More specifically, the GPS data showed that the Defendant's vehicle was in proximity to the addresses of two individuals who had been involved in controlled

8

transactions with law enforcement. Dkt. 724-3 at ¶¶ 36-39, 44-47. Accordingly, Judge Hoppe had a "substantial basis" to believe that an extension of the tracking warrant would continue to undercover evidence of drug trafficking activity.

The Defendant makes much of the fact that the affidavits relied, in part, on information provided by two unnamed SOIs who were federal defendants. He contends "nothing was presented to the magistrate to permit independent review of reliability and credibility of these sources of information." Dkt. 711 at 3; Dkt. 712 at 3. That is a misreading of the affidavits. As noted above, *the SOIs corroborated each other* and provided both innocuous information and allegations of drug trafficking activity that *Government investigators corroborated* (the Defendant's type of vehicle, Burgess's clothing business, traces of drugs in a box outside the business, interactions with a known methamphetamine distributor). To be sure, a caveat to the SOIs' credibility is that their allegations were made in "proffer interviews." As the Government notes, these kinds of statements are made when an individual cooperates with law enforcement "in hope of a lower sentence in their own cases." Dkt. 724 at 19. SA Ott disclosed this context in the affidavits so there was "no confusion as to who the SOIs were or their motivations for speaking with law enforcement." *Id*.

Relevant case law underscores that valid search warrants are often issued based on information that informants provide to law enforcement. The Fourth Circuit has explained that "[i]t is well settled that probable cause may be founded upon hearsay and information received from informants." *United States v. DeQuasie*, 373 F.3d 509, 518 (4th Cir. 2004). "[T]here is no bright-line rule as to when such information may establish probable cause" — indeed, "one simple rule" does not apply in every instance. *Id*. (citing *Adams v. Williams,* 407 U.S. 143, 147 (1972)). Relevant considerations in assessing whether information from an informant establishes

9

probable cause include the veracity and basis of knowledge of the person providing the information, as well as the degree to which an informant's information is corroborated. *United States v. Hodge*, 354 F.3d 305, 309 (4th Cir. 2004); *see also United States v. Gondres-Medrano*, 3 F.4th 708, 715 (4th Cir. 2021) ("An informant's 'veracity' or 'reliability' and his 'basis of knowledge' are relevant considerations in the totality-of-the-circumstances analysis, but neither consideration is necessary. For in 'determining the overall reliability of a tip,' a 'deficiency' in one consideration may be 'compensated for' by some other indicia of reliability or 'a strong showing as to' another consideration.") (quoting *Gates*, 462 U.S. at 230, 233).

There is no absolute requirement that police verify an informant's tip through their own investigation for the information to be credible. *DeQuasie*, 373 F.3d at 519 (citing *United States v. Blount,* 123 F.3d 831, 836 (5th Cir. 1997) (en banc)). But corroboration can certainly bolster an informant's credibility. *Gates*, 462 U.S. at 245 ("Because an informant is right about some things, he is more probably right about other facts") (quoting *Spinelli v. United States*, 393 U.S. 410, 427 (1969) (White, J., concurring)). In *United States v. Hodge*, for example, the Fourth Circuit found substantial basis existed for the magistrate judge's finding of probable cause when, among other things, a warrant application noted that law enforcement corroborated an informant's tips regarding a defendant's real and assumed name, phone number, and vehicle. 354 F.3d at 309. In *United States v. Lalor*, 996 F.2d 1578, 1581 (4th Cir. 1993), the Fourth Circuit noted that information from one informant can corroborate information from another. Moreover, when an informant is correct about seemingly innocent details, a court may find that their allegations of criminal activity carry more weight. In *Lalor*, informants provided details about a defendant's alias, address, and vehicle that law enforcement determined to be accurate. *Id*. The Fourth Circuit explained that "[c]orroboration of apparently innocent details of an informant's

Case 3:23-cr-00015-NKM-JCH    Document 801    Filed 05/02/25    Page 11 of 16
Pageid#: 4780

report tends to indicate that other aspects of the report are also correct. In this case, confirmation of Lalor's address, vehicle and alias gives credence to the allegations of criminal activity." *Id*. (citations omitted).

This case involves informants who corroborated each other *and* provided information that law enforcement at least partially corroborated. The sources of information both provided law enforcement with seemingly innocent details about the Defendant, such as his name and nickname ("Rock"). SOI 1 described the Defendant's vehicle as a Hellcat charger. All these details proved to be correct[1] and provided reason to view them as credible. Additionally, the informants alleged criminal activity by the Defendant. For example, SOI 1 alleged that the Defendant used Burgess's clothing company to transport drugs in the company's product. SOI 2 claimed to have purchased cocaine and methamphetamine from the Defendant. The subsequent law enforcement investigation uncovered evidence that was consistent with these sources' accounts. This included drug residue in a box outside Burgess's business; the presence of both the Defendant and a known methamphetamine distributor, Christmas, outside of the business; and the documented interactions between the Defendant and Christmas, including their trip to the airport parking lot. All these facts provided additional credibility to the informants' accounts. This was particularly important because the affidavit did not indicate that either source had a proven record of providing reliable information in the past. *See Gondres-Medrano*, 3 F.4th at 716 ("corroboration can confirm the reliability of an informant who is known (rather than anonymous) but whose credibility is unknown to the officer. Some corroboration is still required with no track record of reliability.") (citations omitted).

---

[1] Although SOI 1 referred to the Defendant's vehicle as a "dark grey Hellcat charger," Dkt. 724-2 at ¶ 16, and law enforcement subsequently saw him in a black Hellcat Charger, *id*. at ¶ 22, the SOI's description was still generally accurate. To the extent that the Defendant argues that this is a major discrepancy, law enforcement corroborated several other allegations to render the sources' statements credible enough to cite in the affidavits.

11

The Defendant contends that the affidavits are deficient because they reflect government surveillance of "completely innocuous behavior." Dkt. 711 at 4; Dkt. 712 at 4. It is true that law enforcement did not support the affidavits with information that definitively proved the Defendant's alleged drug trafficking activities, such as a recorded transaction between the Defendant and Christmas, Dkt. 712 at 4, or surveillance of his conduct at the Fairfax County address. However, that is not the standard for evaluating a warrant application. The Government only needed to present information that would establish "a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Blakeney*, 949 F.3d 851, 859 (4th Cir. 2020). As explained earlier, probable cause is "not a high bar" and law enforcement officers "need not 'rule out a suspect's innocent explanation for suspicious facts' to obtain a warrant." *United States v. Bosyk*, 933 F.3d 319, 325 (4th Cir. 2019) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 586, 588 (2018)). The Supreme Court has rejected the Defendant's argument that surveillance of otherwise non-criminal conduct cannot form the basis for probable cause. In *Gates* the Court explained that

> [P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.... [I]nnocent behavior frequently will provide the basis for a showing of probable cause; to require otherwise would be to *sub silentio* impose a drastically more rigorous definition of probable cause than the security of our citizens demands. … In making a determination of probable cause the relevant inquiry is not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of non-criminal acts.

462 U.S. at 243 n.13. When viewed in the totality of the circumstances, such as law enforcement's prior controlled buys of methamphetamine from Bobby Christmas, the observed interactions between the Defendant and Christmas look particularly suspicious. If the interactions

12

between the two men were viewed in a vacuum, they would probably be innocuous. But again, that is not the proper standard.

In sum, the multiple degrees of corroboration of the SOIs' accounts and the facts uncovered by law enforcement's own investigation, along with the reasonable inferences that could be drawn from this information, provided Judge Hoppe with "a substantial basis for concluding that a search would uncover evidence of wrongdoing." *Bosyk*, 933 F.3d at 325 (quoting *Gates*, 462 U.S. at 325).

**B. Even if the warrants are invalid, the Government acted in objectively reasonable reliance on the warrants and the evidence obtained pursuant to them will not be suppressed**

Although the exclusionary rule generally precludes the admission of evidence obtained from an unconstitutional search, the Supreme Court has articulated a "good faith exception" to this rule. Thus, "evidence obtained by an officer who acts in objectively reasonable reliance on a search warrant will not be suppressed, even if the warrant is later deemed invalid." *United States v. Thomas*, 908 F.3d 68, 72 (4th Cir. 2018) (citing *United States v. Leon*, 468 U.S. 897, 922 (1984)). However, this exception does not apply in four circumstances:

> (1) when the affiant based his application on knowing or reckless falsity; (2) when the judicial officer wholly abandoned his role as a neutral and detached decision maker and served merely as a 'rubber stamp' for the police; (3) when the affidavit supporting the warrant was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) when the warrant was so facially deficient that the executing officers could not reasonably have presumed that the warrant was valid.

*United States v. Wellman*, 663 F.3d 224, 228-29 (4th Cir. 2011). Here, the kind of arguments that the Defendant has raised — essentially, "allegation[s] that a search warrant application contained

13

grossly insufficient information" — are "best analyzed under the third *Leon* exclusion." *Id*. at 229.

The two affidavits bear many of the indicia of strong search warrant applications. *See, e.g.*, *id*. at 229; *United States v. Rodriguez*, 827 Fed. Appx. 293, 295 (4th Cir. 2020) (unpublished). In both affidavits, SA Ott provided an overview of his professional background and expertise in investigating narcotics trafficking organizations. Dkt. 724-2 at ¶¶ 1-6; Dkt. 724-3 at ¶¶ 1-7. His statements of probable cause did not only rely on the statements of the two SOIs. He also relied on the results of ongoing investigative work, including electronic surveillance, tests for drug residue on a box located at co-defendant Burgess's business, and controlled purchases of methamphetamine from Christmas. Dkt. 724-2 at ¶¶ 18-28; Dkt. 724-3 at ¶¶ 20-30. With respect to the application to renew the tracking warrant, SA Ott presented information demonstrating that the GPS monitoring had produced fruitful information showing that the Defendant's vehicle had traveled to two significant addresses — one associated with an individual "linked to two other active DEA investigations," Dkt. 724-3 at ¶ 38, the other with an individual who sold 460 grams of methamphetamine in a controlled purchase. *Id*. at ¶ 46. Based on the "totality of this information," the affidavits supporting the tracking warrants were "not so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Wellman*, 663 F.3d at 229.

Defense counsel suggested at the March 27, 2025 hearing that the good faith exception should not apply because the affidavit contains an inaccurate summary of the proffer interviews with SOI 1 and SOI 2. This matter was raised for the first time at the hearing on the motion to suppress, and the Defendant has not requested a "*Franks* hearing" with respect to the tracker warrant affidavits pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978); *see also United States v.*

14

*Hall*, 2021 WL 5754904, at *4 n.1 (4th Cir. Dec. 3, 2021) (unpublished) (noting that "[a] *Franks* violation is not subject to the good-faith exception to the usual remedy of suppression"); *United States v. Srivastava*, 411 Fed. Appx. 671, 675 (4th Cir. 2011) (unpublished) ("A warrant that violated *Franks* is not subject to the good-faith exception to the exclusionary rule."). That said, even if the Court were to consider investigative reports related to proffer interviews that the Defendant primarily discussed in relation to a different motion for a *Franks* hearing (regarding an affidavit for a residential search warrant), *see* Dkts. 761-1, 761-2, 761-3, the Defendant has not made out an allegation of a *Franks* violation for the Court to even hold a hearing on the matter. He would need to make a substantial preliminary showing that (1) the false statement was made knowingly and intentionally or with reckless disregard for the truth and (2) the false information was essential to the probable cause determination. *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990); *cf. United States v. Moore*, 477 Fed. Appx. 102, 108 (4th Cir. 2012) (unpublished) (applying *Colkley* in assessing whether an alleged omission rendered an affidavit misleading to prevent the application of the *Leon* good faith exception); *United States v. Andrews*, 577 F.3d 231, 238-39 (4th Cir. 2009) (same). He has presented no information related to the first prong with regard to the affiant and he either misconstrues the allegedly false information or emphasizes what would amount to a minor inaccuracy that does not negate probable cause.

From what the Court could gather from defense counsel's oral argument, the Defendant contends that false information appears in the GPS tracker warrant affidavits. Specifically, he takes issue with statements in the affidavits that SOI 1 and SOI 2 corroborated one another, Dkts. 724-2 at ¶ 12; 724-3 at ¶ 14, and that both sources referred to Burgess as aiding the Defendant's drug trafficking, Dkts. 724-2 at ¶ 13; 724-3 at ¶ 15. This information appears in statements

15

summarizing what law enforcement had learned from these proffer interviews when they are considered together. As discussed above, the sources corroborated one another on certain details, such as the Defendant's identity and his alleged involvement with drug trafficking. This is consistent with the investigative reports. The Court agrees that the documents do not show that SOI 2 specifically stated that Burgess was involved with the Defendant's drug trafficking. Dkt. 761-3 at ¶ 8. Still, even if the summary statements in the tracking warrant affidavits misstated or inaccurately implied that SOI 2 made this allegation about Burgess, this error only affected one paragraph, Dkts. 724-2 at ¶ 13; 724-3 at ¶ 15, in what were otherwise comprehensive affidavits. This would not have been essential to the probable cause determination for either tracker warrant because there were plenty of other facts – including law enforcement's own efforts to corroborate information from the SOIs – that would have provided probable cause for the tracking warrants. Accordingly, the Defendant has not provided the Court with reason to find that a possible *Franks* violation occurred that would render the *Leon* good faith exception inapplicable.

In sum, the *Leon* good faith exception applies to the tracker warrants and evidence derived from tracking the Defendant's vehicle will not be suppressed.

## CONCLUSION

For the reasons provided above, the two motions to suppress the tracker warrants, Dkts. 711, 712, are **DENIED**. The Court will issue an accompanying order on this date.

Entered this 2nd day of May, 2025.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE

16