```
                                                        CLERKS OFFICE U.S. DIST. COURT
                                                          AT CHARLOTTESVILLE, VA
                                                                   FILED
         UNITED STATES DISTRICT COURT
         WESTERN DISTRICT OF VIRGINIA                           May 02, 2025
            CHARLOTTESVILLE DIVISION                         LAURA A. AUSTIN, CLERK
                                                             BY   s/ S. MELVIN
                                                                DEPUTY CLERK
```

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 3:23-cr-00015-018 |
| v. | **MEMORANDUM OPINION** |
| NORMAN EUGENE GOINS, JR. | Judge Norman K. Moon |
| *Defendant.* | |

    Defendant Norman Eugene Goins, Jr. moves to suppress evidence from the execution of a search warrant at 1188 Oak Creek Road in Palmyra, Virginia.[1] Dkts. 726, 747. He contends that law enforcement's affidavit in support of the search warrant failed to establish probable cause because it lacked a sufficient nexus between the residence and the Defendant's alleged offenses. Dkt. 726 at 1. However, the affidavit contained enough information to provide the magistrate judge with a substantial basis for concluding that a search of the residence would uncover evidence of wrongdoing. Under the totality of the circumstances, the affidavit supported probable cause for the issuance of the warrant. Alternatively, even if the search was not supported by probable cause, the good faith exception to the exclusionary rule precludes suppression.

---

[1] Counsel for co-defendant Laqueshia Burgess originally filed this motion. Dkt. 726. Goins's defense counsel subsequently moved "to adopt, conform, and have the benefit of" the motion. Dkt. 747. Shortly thereafter, Burgess pled guilty to a charge of possessing a firearm and ammunition after having been convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g)(1). The Court accepted her plea agreement at a hearing on March 27, 2025. Dkt. 754. In a separate hearing on the same day, counsel for Goins argued his client's motions to suppress as well as the two motions initially filed by Burgess's counsel. Dkt. 758. The Court has granted the Goins's motion to adopt Burgess's motion, Dkt. 804, and attributes its arguments to him throughout this Memorandum Opinion.

At a hearing on March 27, 2025, the Court informed the Defendant that his motion will be denied. Dkt. 758. This Memorandum Opinion elaborates on the reasoning for its decision.

**I. BACKGROUND**

Daniel House, a special agent with the Virginia State Police assigned to the Drug Enforcement Administration as a task force officer, submitted an affidavit to United States Magistrate Judge Joel C. Hoppe on September 5, 2023 as part of a residential search warrant application. Dkt. 739-1 ("House Aff."). Law enforcement sought permission to search a residence located at 1188 Oak Creek Road, Palmyra, Virginia along with its curtilage, outbuildings, and any vehicles on the property. *Id*. at ¶ 1; *id*. at Att. A. The property to be seized was "all evidence relating to violations of distribution and possession with intent to distribute methamphetamine, cocaine, and fentanyl, in violation of 21 U.S.C § 841 and conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846, those violations involving Norman GOINS, Jr. and Laqueshia BURGESS, and their co-conspirators, and occurring after February 1, 2023." *Id*. at Att. B. The warrant application also sought authorization to seize computers and other devices. *Id*. Judge Hoppe approved the warrant the same day based on House's affidavit and affidavits supporting "other search warrants" in this case.[2] Dkt. 739-2.

Law enforcement searched the property the following day. Dkt. 739 at 2. Agents located various firearms, ammunition, magazines, digital scales, packaging material, a money counting machine, and suboxone. *Id*. They also found a black safe containing $45,422, a compressed kilogram of fentanyl, and approximately 4,000 M-30 fentanyl pills, as well as methamphetamine located in a box on top of the safe. *Id*.

---

[2] For example, Judge Hoppe approved a pair of warrants for GPS tracking of the Defendant's vehicle in May and June of 2023. Dkts. 724-2, 724-3.

On September 27, 2023, the grand jury charged the Defendant with conspiracy to distribute and possess with the intent to distribute methamphetamine and fentanyl in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 846; possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g); and possession with intent to distribute fentanyl and methamphetamine in violation of 21 U.S.C. § 841(a), (b)(1)(A), (c). Dkt. 240. In a Second Superseding Indictment issued February 28, 2024, the grand jury charged the Defendant with the same offenses as well as a count of possession of a firearm in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c)(1)(A). Dkt. 323. On April 16, 2025, the grand jury issued a Third Superseding Indictment that only charges the Defendant with (1) possession of a firearm by a prohibited person; (2) possession with intent to distribute fentanyl and methamphetamine; and (3) possession of a firearm in furtherance of drug trafficking. Thus, he no longer faces the conspiracy charge. This case is set for a jury trial in Charlottesville on May 12-16, 2025. Dkt. 736.

The Defendant now challenges the 1188 Oak Creek Road search. He contends that the affidavit submitted by Special Agent House ("SA House") failed to establish probable cause for the search of the residence because it did not show a "sufficient nexus" between the residence and the Defendant's alleged crimes. Dkt. 726 at 1. "[B]ecause the Affidavit is wholly devoid of any information linking the alleged crimes to the Home," the Defendant argues that the affidavit lacked probable cause and all evidence recovered from the search should be suppressed. *Id*. at 6.

## II. LEGAL STANDARDS

The Fourth Amendment protects individuals from "unreasonable searches and seizures," and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or

3

affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

"Whether probable cause for a search exists is a 'practical, common-sense' question, asking whether 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Blakeney*, 949 F.3d 851, 859 (4th Cir. 2020) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983). When assessing probable cause, a magistrate may draw "reasonable, commonsense inferences" based on "the totality of the circumstances." *United States v. Richardson*, 607 F.3d 357, 371 (4th Cir. 2010). Probable cause is "not a high bar" and law enforcement officers "need not 'rule out a suspect's innocent explanation for suspicious facts' to obtain a warrant." *United States v. Bosyk*, 933 F.3d 319, 325 (4th Cir. 2019) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 586, 588 (2018)).

The "nexus" requirement for a search warrant is relevant to the Defendant's motion. "In determining whether a search warrant is supported by probable cause, the crucial element is not whether the target of the search is suspected of a crime, but whether it is reasonable to believe that the items to be seized will be found in the place to be searched." *United States v. Lalor*, 996 F.2d 1578, 1582 (4th Cir. 1993) (citation omitted). The Fourth Circuit has summarized its case law on nexus as follows:

> [T]he nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence.' *United States v. Anderson*, 851 F.2d 727, 729 (4th Cir. 1988). Thus, when factually supported, a sufficient nexus between a defendant's residence and criminal activity may be established even when the affidavit in support of the search warrant does not contain factual information directly linking the items sought to that residence. *United States v. Grossman*, 400 F.3d 212, 217 (4th Cir. 2005). Accordingly, we have declined to require direct evidence that drugs are located in a residence when other facts and

circumstances sufficiently establish probable cause for the search. *Id*. at 214.

*United States v. Moore*, 477 Fed. Appx. 102, 105 (4th Cir. 2012). The Fourth Circuit has "upheld warrants to search suspects' residences and even temporary abodes on the basis of (1) evidence of the suspects' involvement in drug trafficking combined with (2) the reasonable suspicion (whether explicitly articulated by the applying officer or implicitly arrived at by the magistrate judge) that drug traffickers store drug-related evidence in their homes." *United States v. Williams*, 548 F.3d 311, 319 (4th Cir. 2008).

When reviewing a magistrate judge's issuance of a search warrant, this Court asks whether the magistrate "had a substantial basis for concluding that a search would uncover evidence of wrongdoing." *Bosyk*, 933 F.3d at 325 (quoting *Gates*, 462 U.S. at 325). Thus, the magistrate's decision is reviewed with "great deference." *United States v. Briscoe*, 101 F.4th 282, 294 (4th Cir. 2024). This deferential approach is consistent with the Supreme Court's directive in *Illinois v. Gates* that "courts should not invalidate ... warrant[s] by interpreting affidavit [s] in a hypertechnical, rather than a commonsense, manner." 462 U.S. at 236 (quoting *United States v. Ventresca*, 380 U.S. 102, 109 (1965)). When conducting its review, the Court only considers the facts presented to the magistrate in the underlying warrant application. *Boysk*, 933 F.3d at 325 (citing *United States v. Lyles*, 910 F.3d 787, 791 (4th Cir. 2018)).

Although the exclusionary rule generally precludes the admission of evidence obtained from an unconstitutional search, the Supreme Court has articulated a "good faith exception." Accordingly, "evidence obtained by an officer who acts in objectively reasonable reliance on a search warrant will not be suppressed, even if the warrant is later deemed invalid." *United States v. Thomas*, 908 F.3d 68, 72 (4th Cir. 2018) (citing *United States v. Leon*, 468 U.S. 897, 922 (1984)).

5

### III. DISCUSSION

**A. Probable cause existed to support the search warrant**

*1. Summary of the affidavit*

SA House's 27-page affidavit provided a detailed overview of the investigation. He opened the affidavit with his own professional background, which includes 18 years with the Virginia State Police. House Aff. at ¶ 2. SA House has conducted numerous investigations of federal narcotics law violations and has experience with "complex, cross-jurisdictional investigations into large-scale narcotics-trafficking organizations." *Id*. at ¶¶ 5-6.

In identifying the residence to be searched, SA House explained that tax records, appraisal records, and other public records showed that Burgess owned the property. *Id*. at ¶¶ 10-12. Indeed, she bought the home just a year before, in June 2022, with a Federal Housing Administration loan. *Id*. at ¶12.

SA House explained that the investigation into the Defendant's alleged conduct dated back to early 2023. Starting in February 2023, the DEA Charlottesville Post of Duty and Virginia State Police Jefferson Area Drug Enforcement ("JADE") Task Force had had been "investigating a large-scale methamphetamine-trafficking organization operating in the Charlottesville, Virginia area." *Id*. at ¶ 13. In February and March of 2023, DEA and VSP interviewed two sources of information (SOIs 1 and 2) who "both made statements against their own penal interests." *Id*. at ¶ 14. Among their allegations was that the Defendant, aided by his girlfriend, Burgess, led an organization that trafficked in methamphetamine and cocaine.[3] *Id*. Based on these interviews law enforcement believed that the Defendant was a source of supply to two individuals who

---

[3] The Court acknowledges that the Defendant takes issue with how the affidavit characterizes the statements of both SOIs. These objections are addressed in a separate Memorandum Opinion issued this day resolving the Defendant's motion for a *Franks* hearing. Dkt. 803.

controlled the drug trade on Cleveland Avenue in Charlottesville – TyQuane Gregory and Dushaun Gregory. *Id*.

SA House then detailed law enforcement's investigative steps up to that point, as well as other pieces of background information. Relevant factual allegations include the following:

1. EMTs responded to two drug overdoses at 1188 Oak Creek Road involving the Defendant. These occurred on April 23, 2023, and September 2, 2023 (just days before SA House signed his affidavit on September 5, 2023). *Id*. at ¶¶ 18-20. On both occasions, emergency responders found the Defendant unconscious and receiving CPR when they arrived. *Id*. During each incident, EMTs provided the Defendant with Naloxone and he regained consciousness. *Id*. Naloxone is an opioid antagonist used to reverse the effects of opioid-based drugs. *Id*. at ¶ 20. He received additional medical treatment at hospitals in Charlottesville. *Id*. at ¶¶ 18-19.

2. On August 10, 2023, a different informant, SOI 3, made statements to law enforcement "against their own penal interest." *Id*. at ¶ 24. SOI 3 alleged that they had firsthand knowledge of the Defendant and Burgess's drug trafficking activities. They said they observed Burgess carrying $50,000 cash and "multiple ounces of cocaine." *Id*. SOI 3 also alleged that the defendant was the "Big Dog" and a significant, million-dollar source of supply. *Id*. at ¶ 25. SOI 3 alleged that the Defendant would receive a large shipment of drugs and firearms ("10 kilos of fentanyl, 30 pounds of ice [methamphetamine], guns, switches [fully automatic firearm conversion kits], and .300 blackouts.") in August or September of 2023. *Id*.

7

3. On June 6, 2023, August 15, 2023, and August 22, 2023, law enforcement conducted controlled buys of methamphetamine from Dushaun Gregory. *Id*. at ¶¶ 27-46.[4]

4. GPS data from between June 26, 2023 and August 19, 2023 showed that the Defendant's vehicle made eight short visits to Dushaun Gregory's residence in the Richmond, Virginia area. *Id*. at ¶ 47. These stops usually lasted half an hour or less. *Id*. at ¶ 49. Half of those visits were followed by stops at a Chase Bank branch off Broad Street in Richmond. *Id*. at ¶ 47. The Defendant's vehicle also made 10 other visits to this bank. *Id*. at ¶ 48. Based on his training and experience and his understanding of the investigation, SA House alleged that these visits to Gregory's residence were "resupply deliveries of controlled substances and/or the collection of drug proceeds." *Id*. at ¶ 49.

5. When SOI 3 spoke with law enforcement on August 10, 2023, they alleged that the Defendant and Burgess used an individual named Richard Jones to traffic cocaine. *Id*. at ¶ 24, 26. On August 25, 2023, law enforcement encountered a named Richard Jones, III after observing him leaving the 1188 Oak Creek Road property. More specifically, on the morning of August 25, 2023, law enforcement spotted a stolen Hyundai sedan[5] outside the residence. *Id*. at ¶ 50. Later that morning, law enforcement observed the sedan travel to a gas station, where an individual – later identified as Jones – exited the car, entered the store, and returned with purchased

---

[4] The Court also notes that the Defendant has objected to the Affidavit's reference to controlled purchases involving an individual referred to as CS-2 because it did not disclose that CS-2 stole money from the Government. Dkt. 737 at 6-7; Dkt. 746 at 8 n. 2 (clarifying that the Defendant's motion for a *Franks* hearing incorrectly refers to the individual who stole funds as SOI 3 because the actual individual who engaged in misconduct was the confidential informant who participated in the controlled purchases on August 15 and 22, 2023). This is discussed in the Memorandum Opinion issued this day resolving the Defendant's motion for a *Franks* hearing. Dkt. 803.

[5] The vehicle, a 2023 gray Hyundai sedan, had been rented by a third party and not returned. It was then reported as stolen. Law enforcement learned this when it spotted the vehicle outside the 1188 Oak Creek Road property and ran a Virginia registration check on the license plate. House Aff. at ¶ 50.

8

goods. *Id*. at ¶ 51. After fueling up the vehicle, he returned to the Oak Creek Road address. *Id*. at ¶ 52. In the afternoon, the same vehicle left the residence and traveled north on James Madison Highway. *Id*. at ¶ 53. Five minutes later, at 2:05 p.m., VSP troopers stopped the vehicle and found Jones to be the driver and sole occupant of the car. *Id*. at ¶ 54. In a post-*Miranda* interview, Jones said he believed his cousin rented the sedan and he did not know the vehicle was stolen. *Id*. at ¶ 54. When law enforcement asked where he was coming from, he claimed to have been coming from Pleasant Grove where he believed a fair was taking place. *Id*. He told officials, "I was just riding around, literally just riding around. I was like I'm going to go to the fair and take my mom to work. My mom works at the Westminster on Pantops. That's where I was headed to now. I'm not lying." *Id*. This was inconsistent with law enforcement's observation of him departing from, returning to, and again leaving the Oak Creek Road address. *Id*. SA House explained that Jones's statement "remov[ed] himself from any connection to the TARGET ADDRESS and Norman GOINS, Jr." *Id*. Moreover, a search of the vehicle found "27 counterfeit $100 bills, suspected powder cocaine, and three suspected pressed fentanyl tablets." *Id*. at ¶ 55. A field test of the suspected cocaine yielded a positive result for cocaine, although SA House noted that at the time of the affidavit law enforcement awaited further test results from the Virginia Department of Forensic Science. *Id*. at ¶ 56. Finally, law enforcement found that Jones was in possession of a business card belonging to Burgess. *Id*. at ¶ 55.

6. The Defendant engaged in large cash transactions in preceding years. This included depositing $182,100 at Maryland and Nevada casinos between December 2020 and

9

January 2023; depositing $148,400 in cash to Wells Fargo accounts between February 2019 and April 2020; and purchasing a 2019 Nissan Altima from a Fredericksburg, Virginia car dealership in June 2021 for $20,800. *Id.* at ¶¶ 59-61. Although the Defendant possessed large amounts of cash, Virginia Employment Commission records showed that he was "negative for employment, wage, and/or benefit history in Virginia during the seven previous quarters in [2]022 and 2023." *Id.* at ¶ 63.

7. SA House stated that based on his training and experience, "drug traffickers and money launderers routinely utilize businesses and financial institutions to structure, layer, and integrate the proceeds of their illegal activity." *Id.* at ¶ 62.

8. Both the Defendant and Burgess were previously convicted in Virginia courts for drug-related felonies. The Defendant was convicted in Charlottesville Circuit Court in March 2005 for distribution of a schedule I/II drug; he was sentenced to 20 years imprisonment with 11 years suspended. *Id.* at ¶ 65. He was released in September 2011. *Id.* Burgess was convicted in Albemarle County Circuit Court in February 2017 for distribution of a schedule I/II drug on or about July 27, 2016, and for distribution of a schedule I/II drug on or about October 11, 2016. *Id.* at ¶ 64. She was sentenced to 10 years imprisonment with eight years suspended. *Id.* She was released in September 2019. *Id.*

9. Based on his training and experience, SA House also described narcotics traffickers' typical practices. These include maintain large amounts of currency "to finance and sustain their ongoing narcotics business" and maintaining records of financial instruments, fund transfers, transportation, and the ordering, sale, and distribution of narcotics. *Id.* at ¶ 66. He also stated that "[i]t is common for drug traffickers to

10

conceal proceeds of drug sales and records of drug transactions in secure locations within their residence(s), their business(es) and/or other locations over which they maintain dominion and control." *Id*. Thus, traffickers often build "stash places" in such locations where they store evidence of their narcotic business. *Id*.

SA House attached two documents to the affidavit. The first provided a detailed description of the residence's exterior features and included an undated photo of the residence with the Defendant outside the front door. Dkt. 739-1 at Att. A. The second identified the property to be seized in detail. In describing the kinds of evidence relevant to the Defendant and Burgess's alleged distribution activities, the document lists books, records, receipts, lists of customers, information related to sources of drugs, financial records, currency, controlled substances, scales, firearms, electronic computers, and cell phones. Dkt. 739-1 at Att. B.

### 2. *The affidavit established nexus between alleged drug trafficking activity and the residence*

The Defendant's main argument is that the affidavit fails to establish a "nexus" between alleged drug trafficking and 1188 Oak Creek Road. Dkt. 726 at 4-6. He asserts that "the Affidavit is devoid of any observations of *anything* or *anyone* entering or exiting the Home." *Id*. at 5 (italics in original). Moreover, he contends that various details in the affidavit either fail to establish a connection with the address or have an entirely innocent explanation. For example, the Defendant argues that his vehicle's locations in the Richmond area - "over an hour away from the home" – do not show that his vehicle was ever tracked to the home or that he was the driver of the vehicle while it was in Richmond. *Id*. at 4. He also contends that his two overdoses do not substantiate the claim that he was involved with drug trafficking. *Id*. at 5 n.1. Finally, the

11

Defendant takes the position that nexus is absent because the affidavit fails to expressly allege that the address was the "residence" of the Defendant or Burgess. *Id*. at 5-6. He states that "the only information connecting either of the Defendants to the Home is the fact that Burgess purchased the home in 2022 and the property records indicated she still owned it." *Id*. at 6.

The Defendant's read of the affidavit fails to appreciate the "totality of the circumstances" standard that governs probable cause determinations. Magistrates "draw reasonable, commonsense inferences" from the information presented in an affidavit. *Richardson*, 607 F.3d at 371. And, as noted earlier, the Fourth Circuit has "upheld warrants to search suspects' residences and even temporary abodes on the basis of (1) evidence of the suspects' involvement in drug trafficking combined with (2) the reasonable suspicion … that drug traffickers store drug-related evidence in their homes." *Williams*, 548 F.3d at 319.

Here, the affidavit contained an abundance of information related to the Defendant and Burgess's alleged involvement with drug trafficking *and* reasonable suspicion that drug-related evidence was at the residence. The allegation of the Defendant's involvement in drug trafficking was consistent with the following: (1) the various statements of the SOIs, House Aff. at ¶¶ 14, 24-26; (2) the proximity of the Defendant's vehicle on multiple occasions to the address of Dushaun Gregory, an individual from whom law enforcement had made multiple controlled purchases of methamphetamine, *id*. at ¶ 47; (3) the Defendant's stops at a bank branch following visits to Gregory's address, *id*. at ¶ 48; (4) the Defendant's large cash transactions and lack of any employment, wage, or benefit history in Virginia for seven prior quarters in 2022 and 2023, *id*. at ¶¶ 59-61, 63; (5) the affiant's statement, based on his expertise, that traffickers often utilize businesses and financial institutions to structure and integrate their proceeds, *id*. at ¶ 62; and (6) the Defendant's prior conviction for a drug distribution charge. *Id*. at ¶ 65. Similarly, the affidavit

12

contained information that would lead to the inference of Burgess's possible involvement with drug trafficking: (1) the statements of the SOIs that she aided the Defendant and acted as a "runner" for one of the alleged groups within the Defendant's drug trafficking organization, *id*. at ¶¶ 14, 24-26; (2) SOI 3's allegation that Burgess had, at one point, possessed multiple ounces of cocaine on her person and $50,000, *id*. at ¶ 24; (3) the fact that when law enforcement pulled over Jones after he left Burgess's property in a stolen vehicle, he possessed her business card and his vehicle contained suspected cocaine and fentanyl, which was consistent with SOI 3's allegation that Burgess (and the Defendant) worked with Jones and engaged in narcotics trafficking, *id*. at ¶¶ 25-26, 53-56; and (4) her pair of prior drug-related felony convictions. *Id*. at ¶ 64. The multitude of factual allegations, when taken together, tied the Defendant and Burgess to suspected drug trafficking activities.

As for the nexus between 1188 Oak Creek Road and narcotics distribution activity, the affidavit contained plenty of information from which the magistrate could have reasonably concluded there was a "fair probability" that evidence of drug trafficking would be located at the home. *Blakeney*, 949 F.3d at 859.

The factual allegations in the affidavit supported a commonsense inference that the Defendant and Burgess resided at the home. After all, the affidavit states that the Defendant and Burgess were in a romantic relationship, House Aff. at ¶ 14, Burgess had purchased the property the prior year with a federal home loan, *id*. at ¶ 10-12, and the Defendant had been at the property just a few days before the search warrant application, when he suffered an overdose requiring medical attention. *Id*. at ¶ 19. A photograph attached to the warrant affidavit also depicted the Defendant outside the front door. *Id*. at Att. A. Additionally, when Jones left the property on August 25, 2023, he possessed Burgess's business card. *Id*. at ¶¶ 53, 55. The totality

13

of the circumstances supported the inference that the Defendant and Burgess lived at the home, even if the affiant did not expressly allege that the couple resided there.

Other facts provided reasonable suspicion that evidence of drug trafficking activity would be located at the residence. The Defendant seems to suggest that direct evidence of drug activity inside the home was necessary for the probable cause determination. Dkt. 726 at 5 ("[T]he Affidavit does not describe circumstances that indicate that evidence of the alleged crimes was likely to be stored at the Home. The confidential informants never once said that the alleged methamphetamine and cocaine DTO run by Burgess and Goins was being operated out of the Home."). But as cases like *Grossman* underscore, "specific evidence of the existence of drugs in a residence" is not necessary "where other facts sufficiently establish probable cause for the search." 400 F.3d at 214. In addition to facts that are consistent with the Defendant and Burgess being involved in drug trafficking and living at the home, other critical pieces of information in the affidavit supported probable cause that evidence of methamphetamine, cocaine, and fentanyl trafficking would be found at the property. First, the Defendant suffered two opioid-related drug overdoses at the address in April and September 2023, House Aff. at ¶¶ 18-19, which suggests drugs were on the premises just days before the search warrant application. Second, the suspected drug runner, Jones, visited the property on August 25, 2023, left the address in a stolen vehicle containing counterfeit bills, cocaine and fentanyl, and lied about his whereabouts. *Id*. at ¶¶ 50-57. This raises a reasonable inference that he wished to avoid telling law enforcement he had been at the property and that evidence related to what law enforcement found in the vehicle could be at the residence. Third, SOI 3 told law enforcement on August 10, 2023 that Goins expected a large shipment of fentanyl and methamphetamine in August or September of that year. *Id*. at ¶ 25. SA House's statement, based on his training and experience, that traffickers

14

often maintain evidence of their business at their homes, *id*. at ¶ 66, would have supported the reasonable inference that evidence related to this transaction could be found at the Defendant's home.

In sum, the affidavit supported several inferences: law enforcement had gathered evidence that the Defendant and Burgess were involved in narcotics trafficking; the couple resided at the Oak Creek Road address; and there was reasonable suspicion that drug-related evidence would be found at the property. The facts provided sufficient "nexus" between the alleged offenses and the residence. Accordingly, the magistrate had "a substantial basis for concluding that a search would uncover evidence of wrongdoing." *Bosyk*, 933 F.3d at 325.[6]

Even though probable cause is "not a high bar" to clear, *id*. at 325, the Defendant contends that SA House's affidavit failed to meet it because some of the information did not directly allege a connection to the home or had an innocent explanation. These lines of argument invite the Court to engage in an improper piecemeal reading of the affidavit or to place too much weight on the Defendant's innocent explanations. For example, he argues that the information about his opioid-related overdoses is entirely unrelated to illicit drug activity because the affidavit failed to state whether it was ever determined that he overdosed from illegal opioids and "naloxone can also be used to treat overdoses of legal opioids as well as tramadol." Dkt. 726 at 5 n.1. But law enforcement was not required to "rule out a suspect's innocent explanation for suspicious facts" to secure the warrant. *Bosyk*, 933 F.3d at 325. As the Government correctly notes, fentanyl is an opioid and SOI 3 had alleged that the Defendant trafficked in it. Dkt. 739 at

---

[6] The Defendant argues that this case is like *United States v. Lalor*, 996 F.2d 1578 (4th Cir. 1993). Dkt. 726 at 2-4. In *Lalor*, the Fourth Circuit held that a residential search warrant in a drug trafficking case lacked probable cause because law enforcement's affidavit was "devoid of any basis from which the magistrate could infer that evidence of drug activity would be found" at the target location. *Id*. at 1582. But as this Court's analysis of SA House's affidavit underscores, the affidavit here was far from "devoid" of information linking possible criminal activity to the Oak Creek Road residence. *Lalor* is inapplicable.

15

n.3, House Aff. at ¶ 25. The Defendant contends that traffickers do not "get high on [their] own supply," but the magistrate judge was not required to ignore evidence to the contrary.[7] The Defendant also suggests that the affidavit's account about controlled purchases and the locations of the Defendant's vehicle is irrelevant because it fails to establish a "geographic connection" between alleged criminal offenses and the house. Dkt. 726 at 4-5. But the Court agrees with the Government that such information was not essential for demonstrating that the Defendant lived at the property. Dkt. 739 at 14-15. Instead, these aspects of the affidavit showed a connection between the Defendant and an individual who participated in controlled purchases. This, in turn, supported the inference that the Defendant may have been resupplying the individual or collecting proceeds from him. These facts also raised the likelihood that the Defendant possessed large quantities of narcotics and cash that one might reasonably expect him to have at his residence – which would be consistent with SA House's statement about how traffickers often keep such evidence at their homes. House Aff. at ¶ 66.

Finally, the Defendant's counsel suggested at oral argument that Judge Hoppe improperly considered information outside SA House's affidavit when he inserted language in the warrant stating that he found the affidavits "supporting this *and other search warrants*" established probable cause for the 1188 Oak Creek Road search. Dkt. 739-2 (italics added). Defense counsel cited to a district court case for the proposition that inquiries into probable cause are constrained to the four corners of a law enforcement officer's sworn affidavit. *United States v. Lipscomb*, 386 F. Supp. 3d 680, 684 (E.D. Va. 2019). But this same decision acknowledges that a district court is similarly constrained to reviewing a probable cause determination based on facts set forth in the

---

[7] At oral argument the Defendant's counsel argued that another problem with the affidavit's descriptions of the drug overdoses is that it did not say *where* on the property emergency responders found the Defendant. But the absence of such detail does not negate how the two overdoses connected the Defiant with the address and raised the likelihood that evidence of illicit drugs would be found on the premises.

16

affidavit. *Lipscomb*, 386 F.Supp. at 684. This principle is consistent with Fourth Circuit case law holding that "when evaluating whether the magistrate had a substantial basis to find probable cause" a reviewing court "may not go beyond the information actually presented to the magistrate during the warrant application process." *United States v. Lyles*, 910 F.3d 787, 791 (4th Cir. 2018) (citing *Owens ex rel. Owens v. Lott*, 372 F.3d 267, 277 (4th Cir. 2004)). Even if the magistrate judge erred in citing to prior search warrant applications in this case when he issued the search warrant for 1188 Oak Creek Road, the House Affidavit itself contained more than enough information to support probable cause.

**B. The good faith exception applies**

Under the good faith exception to the exclusionary rule, "evidence obtained by an officer who acts in objectively reasonable reliance on a search warrant will not be suppressed, even if the warrant is later deemed invalid." *United States v. Thomas*, 908 F.3d 68, 72 (4th Cir. 2018) (citing *United States v. Leon*, 468 U.S. 897, 922 (1984)). However, this exception does *not* apply in four circumstances:

> (1) when the affiant based his application on knowing or reckless falsity; (2) when the judicial officer wholly abandoned his role as a neutral and detached decision maker and served merely as a 'rubber stamp' for the police; (3) when the affidavit supporting the warrant was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) when the warrant was so facially deficient that the executing officers could not reasonably have presumed that the warrant was valid."

*United States v. Wellman*, 663 F.3d 224, 228-29 (4th Cir. 2011).

Although the Defendant's briefing on his motion to suppress does not even acknowledge the good faith exception, at oral argument defense counsel seemed to suggest that the good faith exception was inapplicable because the affidavit allegedly contained misleading statements and

17

omissions. This line of argument ties into the first of the four exceptions to *Leon*. Nevertheless, for the reasons set forth in a separate Memorandum Opinion issued this date denying the Defendant's motion for a *Franks* hearing, Dkt. 803, the Defendant has failed to show the affidavit was based on "knowing or reckless falsity." Additionally, such alleged misleading statements and omissions had no material impact on the probable cause determination to rise to the level of a *Franks* violation that would preclude the application of *Leon*. *See United States v. Hall*, 2021 WL 5754904, at *4 n.1 (4th Cir. Dec. 3, 2021) (unpublished) (noting that "[a] *Franks* violation is not subject to the good-faith exception to the usual remedy of suppression"); *United States v. Srivastava*, 411 Fed. Appx. 671, 675 (4th Cir. 2011) (unpublished) ("A warrant that violated *Franks* is not subject to the good-faith exception to the exclusionary rule.").

None of the other exceptions to *Leon* are applicable. The Defendant presents no reasons to believe that the magistrate acted as "rubber stamp" for law enforcement or that the warrant was "so facially deficient" that an officer could not have believed in its validity. Indeed, the House Affidavit bears many qualities of a strong search warrant application. The 27-page affidavit is thorough, reflects months of investigative work, and summarizes the affiant's experience with narcotics investigations and knowledge of drug trafficking practices. "Considering the totality of this information before the issuing judge, the affidavit was not so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *United States v. Rodriguez*, 827 Fed. Appx. 293, 295 (4th Cir. 2020) (unpublished); *Wellman*, 663 F.3d at 229.

In sum, the *Leon* good faith exception applies and the Court will not suppress evidence obtained from the 1188 Oak Creek Road search.

## CONCLUSION

The House Affidavit presented sufficient information to establish probable cause for the search of the Oak Creek Road residence. Alternatively, even if the warrant was invalid, the *Leon* good faith exception applies. Accordingly, the motion to suppress is **DENIED**. An accompanying Order will be entered on this date.

Entered this 2nd day of May, 2025.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE